One of the counsel isn't present in the first case because he was ill, maybe you know that, I'm not sure. It's counsel for Ms. Centeno, I believe. Anyway, the traffic lights or the yellow light gives you two minutes, and when the red light comes on, we ask you to conclude as quickly as you can, unless you're answering a question, well, and including if you're answering a question from the court. And we also appreciate record citations when those are available. This case is number 17-40124, United States v. Rivas-Estrada. So we'll hear first from Mr. Springer. Thank you, Your Honor. It's a pleasure to be here. I'm pleased to court, opposing counsel, and I want to let the court know I'm here with another attorney from my firm, Ms. Damron, who's one of our associates. I represent Mr. Rivas-Estrada, who obviously was accused of conspiring to traffic drugs into the United States and to launder money. He was lumped in with some 29 other defendants in this case, most of whom were not related to him. The offenses, obviously, are serious, but the fact that an offense is serious should not be an invitation to gather defendants en masse, many of whom who are unrelated, so that evidence can be— Did you move to sever? There was no motion to sever, Your Honor, but the case law with respect to motions to sever says that the allegations in the indictment must be taken as true. Because the allegations in the indictment alleged a single conspiracy, that deprived my client's attorney, trial attorney, of the ability to move for a severance until the evidence had come in. Now, he did preserve error. I disagree with the government's brief where the government assumes that no error was preserved in this case. He raised the issue on many occasions. He raised it before trial. He raised it in a motion in limine. He raised it during trial in a number of objections to the evidence. And he raised it again at the close of the government's case when he joined in a motion for judgment of acquittal with the other defendants, urging that there were multiple conspiracies and not a single conspiracy. And the problem with that, of course, is what the United States Supreme Court enunciated in Cadillacos way back in the 1940s when the court held that it deprives a litigant, it deprives a criminal defendant of the right to a fair trial if you lump that criminal defendant in en masse with several other defendants when the record shows that instead of one conspiracy, there actually are multiple conspiracies. And that's what the record showed in this case. Which of these multiple conspiracies was your client not involved in? Our position, Your Honor, is that Mr. Rivas Estrada was not involved with either the Valencia group or the Lozano group. The clearest of these is the evidence with respect to the Lozano group. Mr. Lozano actually testified. His testimony primarily related to his computer where he kept copious records of the money exchanges that came through his suppliers who were identified as of Mr. Meyer. But he obviously was involved in his eponymous Rivas Estrada money laundering organization, right? I'm sorry, Your Honor. There's at least three different money laundering organizations implicated in the conspiracy. You mentioned two. One of them he's at the center of, right? The Rivas Estrada organization. Actually, we think there may have been several of these money laundering organizations. There certainly were, but there was at least one in which he was in the middle, right? And the problem with the case is that evidence came in that involved money remitters that he didn't necessarily do business with. There was no evidence he did business with those. But some of his relatives did, didn't they? I'm sorry, Your Honor? I say didn't some of his relatives do business with those other remitters? Well, I think there is evidence that all three of the large organizations did business with multiple remitters. I mean, the amount of money is startling, really. They had to have a lot of entities doing the money laundering. I think that's fair to say, Your Honor. I wouldn't have a big disagreement with that. What I do disagree with is the fact that some of these organizations that did business with the same money remitters means necessarily that they're related. I don't think you can come to that conclusion based on the evidence. The evidence shows that all of these organizations were trying to get cash transmitted to Mexico and were just going to the handful of businesses that they could find, money remitters that they could find, that would allow them to do that. That doesn't necessarily mean that they had some agreement that those were the remitters that they were going to use. And if you look at the investigators' testimony, the investigators talk about this, and I forget the name of the town in that state in Mexico, where they said 99% of the methamphetamine in the world was manufactured. But that's a town of about 99,000 people. And they said there were multiple organizations that were unrelated that brought methamphetamine out of that town in Mexico. So there was plenty of evidence that these organizations could have been unrelated. The government points to some text messages that were exchanged by a fellow named Talaseca, who at one time did work for my client's organization, but had moved to a different organization by the time the text messages were sent. The evidence cited by the government is that this text message was initiated by Andre Damian Rodriguez, who was the supplier for the Valencia Group. And he claimed that there was money Mr. Talaseca had not sent to him and was complaining about that. And Talaseca said, of course, that the government had taken it. And Rodriguez later texted that the money belonged to Zulima's male cousin. Of course, Zulima was one of the government's major witnesses. And Zulima, in fairness, was a member of my client's organization. But she also denied participation in either of the other two organizations. And Talaseca denied knowing a lot of the people in my client's organization. And the problem with this text message exchange is it doesn't really tell you much. It doesn't tell you whose money it was. And for all we know from the context of the text messages, the reason Rodriguez may have wanted it back was to prevent a turf war between two competing organizations. And you can see that being risky to both of them. But even if you're right that there were multiple conspiracies and your client wasn't implicated in some of them, but was unequivocally implicated in one of them, this court is bound by our decision in Faulkner, which you and the government in your brief trade discussion about. But Faulkner very specifically says that where there is evidence of multiple conspiracies and the defendant is implicated in at least one of them, there is no variance that affects substantial rights. And you have some arguments about Kadiakos, and you have other arguments about the jury instructions. But that doesn't affect the way we review your variance argument on appeal. Because on appeal the only question is, is there a reversible error with respect to the variance between the indictment of – I'm sorry, yes, the indictment of one conspiracy and the proof of multiple. And Faulkner pretty specifically says there's evidence that you're implicated in one. You seem to agree with us that he's implicated in one. And isn't that the end of that argument? We should move on to something else. The reason I think it's not, Your Honor, is because I think the facts of Faulkner are so distinguishable you have to take the court's ruling in the context of those facts. What my reading of the Faulkner case is that what this court was saying is, as in this case, where you've got really what amounts to our position is three chain conspiracies. There are links in the chain that don't necessarily work with the other links in the chain and don't have any knowledge of what the other links in the chain are doing. So just because all of the conspirators aren't guilty of conspiring to commit the same offense, that doesn't mean there are multiple conspiracies. And that's ultimately what the court in Faulkner held was that there weren't multiple conspiracies. In this case, you've got essentially the same thing. You've got the money remitters being found not guilty of the drug trafficking conspiracy but guilty of the money laundering conspiracy. And I think Faulkner would have the discussion in Faulkner has some merit there. With respect to my client, our argument is different. Our argument is that we weren't involved in these other organizations. And there was a substantial amount of evidence about the other organizations offered, not the least of which was Mr. Lozano's computer records that really had absolutely nothing to do with them. Well, let me ask you a question. Let's assume there was error. How can you prove that there was substantial prejudice to your client? Because he seems to have been as close to a kingpin of all this as there was. Well, I think you've really got to look at the court's holding in Caudillacos in some detail to come to that conclusion. On page 776 in Caudillacos, the court explains that the fact that if there were a separate trial against a defendant, that defendant might or might even probably be found guilty is not really the question. What you've got to look at is the totality of the circumstances. And if it's clear from the totality of the circumstances it was not a fair trial, then you have to reverse just on the basis of keeping the system intact. What we say on behalf of Mr. Rivas Estrada is there's all this unrelated evidence that I've already talked about. There was hearsay evidence that came in, most of which involved the Valencia and Lozano organizations. It had nothing to do with my client. He was tried in the Eastern District of Texas. There was no evidence at all that any overt act took place in the Eastern District or any really act at all took place in the Eastern District. But again, did the trial counsel move to change venue? Well, I think once again, Your Honor, the problem with that is how can he do that when the government alleges a single conspiracy and some of the other conspirators clearly did business in the Eastern District of Texas? Just because Mr. Rivas Estrada didn't doesn't necessarily give him a valid basis under those circumstances to request a change of venue. Thank you for listening, and I'll— You have a couple minutes for rebuttal. Thank you. All right, sir. Mr. LaGarza. Good morning. Good morning. May it please the Court. I had the luxury of representing Ms. Felipe Torres in trial, so I'm also coming from the perspective of the trial attorney. She was acquitted on the drug conspiracy, which is the main argument that we have, because I think in the cases that were cited by both sides that were using as authority, Trejo and Cisas, is very important. Number one, the government must prove that she was a knowing participant in an underlying act, and by being acquitted of the drug conspiracy, our position is, how can she be held to those standards that were raised both in Cisas and Trejo, where they talk about specifically—if I can get my notes here— that the government must prove that the defendant participated in knowingly and intelligently promoting the underlying activity. The underlying activity was the drug conspiracy or the drug proceeds coming in. So they have to show that she promoted it. She knowingly and intelligently agreed to enter into this conspiracy to do so. The conflict that we have is that this Court, hearing the same evidence, said she was not guilty of participating in the drug conspiracy. Government, in their brief, cites, well, deliberate ignorance. Well, deliberate ignorance was available to both charges. So our position is the jury, which I hope we give deference to, is saying she did not aid or abet in any way, form, or fashion in the drug conspiracy. And that was the only specified— No, they said you didn't—the government didn't prove that beyond a reasonable doubt. It's not the same thing as saying she didn't do it. Fair enough. So is it your position that you can never— the government can never prevail in a case involving money laundering of drug money unless they also prevail on the drug conspiracy charge? I think my position on that issue, that's a very good question. Had she only been tried for the money laundering and there was no trial going on at the same time for the drug conspiracy, then there could be evidence that comes in, like in the Treviño case, where it's the basis of CESA. That was only a money laundering conspiracy. So there's evidence that can come in that supports the things that I think the court here said are guidelines. You know, substantial ties to the drug organization, substantial involvement in the drug organization. There's none of that here by the jury here finding that she is not guilty. And I think this is one of those little isolated-type cases where the government chose to indict her on both offenses, and there's that inherent conflict. You still have to get there, and that, I think, is the conflict that we have. By a jury saying she's not guilty of the substantive act, which in order to find her guilty of money laundering, they must prove that she entered it knowingly and intentionally to promote that underlying act. Don't they just need to show that she had some knowledge of the illicit nature of the funds she was laundering? But knowledge alone is not enough, and I think this court addressed that. What else does she need on top of that? I'm sorry, what else does the government need to prove on top of that? I think if the government had evidence that she was intricately tied in, she knew the organization, like in the Trevino case, you know, Jose Trevino's brothers are the big cartel members. Here, she's just an owner of a shop, a money remitter shop. Well, that's a little bit more than that. I mean, she turns off the security cameras. She helps them come up with fake names. She structures multiple tens of thousands of dollars in transactions in $1,000 increments. I mean, she literally is sending with different names with one person sitting in front of her, changing the names before they remit the money. So it's not like she's just operating the shop. Why else would she turn off the security cameras? I think we have to look at it from this perspective, if I may. If what we're saying is she did all these things and she was convicted of a drug conspiracy because those things right then and there would lead one to believe, if true, and the jury, if the jury believed those facts to be true, by virtue of them finding her not guilty, my position is the jury is saying that is not true. They did not believe those witnesses. To what element of the crime are you directing this argument? In other words, this was a conspiracy to engage in money? It would be the second element. Which is what? Affinity with the agreement, knowing its purpose, and with the intent to bring it forward. Well, I'm asking. Correct. That's the second element. One is you've got to join in a conspiracy, but she has to know that there is a conspiracy to be part of, so I guess it's both issues. If she's not guilty of a drug conspiracy, how can she knowingly be involved in it? Wait a minute, because according to CESA, when the indictment charges that concealment money laundering, the government must prove the defendant conspired to conduct a financial transaction with proceeds of a specified illegal activity, with knowledge the transaction was designed to conceal or disguise the source of the proceeds. Okay, so what you're arguing is she didn't know that all of these contortions she was going through had to do with proceeds of an illegal activity? Is that what you're saying? I'm saying the government didn't prove it, and the jury didn't buy it. Well, excuse me, but all she had to do was they didn't have to prove that she engaged in the drug dealing herself. It's just that she engaged in the money laundering of the proceeds of the illegal, and she had certificates, right? She had been trained to identify money laundering transactions. I respectfully disagree with that conclusion. I think in some of the holdings in CESA, et cetera, they talk about needing a little bit more, being tied into the organization, understanding how the organization is run. You have a little old lady who is owner of a little shop, and yes, her son— Turning off security cameras, helping out with the just under the number that you'd have to report on and get IDs on. You know, little old ladies can commit crimes. Not my little old lady, Your Honor, with all due respect. And I know my time is up, and I will just close with this comment, that the jury, one could argue, didn't find that evidence to be credible. Well, they found something to be credible because they did convict her. I understand, and that's why we're here. Thank you so much for your time. Okay, thank you. We have a minute for rebuttal. Ms. Hagan? Why did the government indict all of these people together? Because they were part of the same conspiracy, the same ongoing conspiracy. No, I think it's because you wanted to try the case in Sherman and not in Dallas. Well, if you look at the venue in this case, please consider, when you do that, Ms. Amaker's testimony. Rachel Amaker, she was the IRS analyst and agent who analyzed something like 85,000 individual transactions, and one of those handful of organizations that was sending the money to Mexico was MD Income Services. Now, the owner of that company was Margaret Davidson. She testified, and what the evidence showed was that Ms. Davidson lived in Plano. She took the drug proceeds that she had collected back to her house in Plano, where she prepared the deposits to deposit the drug proceeds into her bank account. She made those deposits in Plano, Texas, and those deposits were significant in the amount. And the way that this works, and the reason that that was in furtherance of the conspiracy, is because when these money-manager businesses send the money, send out a wire, the payment processor, the company for which they are the agent, drafts right into their bank account on the next day. Or that day, the record shows, to fund the transaction. And so she had to deposit the drug proceeds, and she did that in Plano, Texas. Well, it's not so much that. I mean, what strikes me as being a loosey-goosey association of these defendants is that, or maybe not exactly appropriate, is that you have Rivas, who's a very large-quantity methamphetamine dealer, and then you have all the remitters that he was . . . through which they were laundering their money, Seriatim, it appears. And I can see his organization conspiring with each one of them separately. I'm not sure I can see why you join him and all of them, you know, proving the meth conspiracy on one side and all the remitters on the other. Well, let me just say one more thing about Davidson, and that is that Zula and Miguel, Rivas Estrada's cousin, wired or went to MD Tax Services to send the drug proceeds. But back to your point, Judge Jones, here you have more than just the text between Taliseca and his boss in Mexico, where his boss, when $44,000 was seized, and Taliseca said it was law enforcement that took it, and his boss indicated he did not believe him. The boss said, give me the money back, and Taliseca said, we don't have the money, it was seized. And the boss said that money belonged to Zula's male cousin, which was either Rivas Estrada or his brother. But in addition to that, you have testimony of one of the money couriers, her name is Maria Rentana, and what she testified to is that Rivas Estrada's cousin, Zula, and another drug courier, Mona Salazar, Monica Salazar, trained her, and from the beginning, it was always understood that she would not be working for Zula for a long time, that instead, Zula would introduce her to someone else, and that's exactly what happened. Zula introduced Rentana to Armando Taliseca, who, according to Rivas Estrada on appeal, was part of this other conspiracy. So there is more evidence to connect them. What connects Lozano to any of this? I mean, is that just basically from the same part of Mexico? I mean, it seems like I understand there's kind of a pattern, but is there anything that connects it to the broader single conspiracy you indicted on? Your Honor, other than the similarity of the transactions, use of the same beneficiaries, use of the same handful, Torres Lopez, actually, in this case, there is not. Is there anything, are you aware of any cases that suggest that simply that kind of pattern is enough to make this one conspiracy as opposed to two? No. So you're really resting pretty heavily on the harmlessness of the. . . Are you able to talk? I have spasmodic dysphonia, so my voice shakes because. . . Well, I'm not trying to embarrass you, but if it's painful to talk, I mean, we can. . . It's not painful. Okay. It just comes out that way. Okay. Like it is. Sorry, then. That's okay. So I'd like to go back to plain error review. As the Court has already pointed out, Mr. Rivas Estrada never moved to sever, and that's important. He never asked for a multiple conspiracy instruction, either before or during the trial. He did not object during the charging conference to the lack of a multiple conspiracy instruction. His Rule 29 motion was not based on variance because of proof of multiple conspiracies. So under Rule 51B, which we know as the contemporaneous objection rule, he did not comply with the rule, so plain error applies. And one other thing on that point, when you look at Judge Mazant's comments at every one of these points during the trial that are identified in the reply brief, you'll see that Judge Mazant understood that Rivas Estrada's contention that there was more than one conspiracy was only an evidentiary issue, whether the statements of co-conspirators would come in against him. And this was Judge Mazant's, one of his first big trials. He says that during the trial. And so the contemporaneous objection rule here was especially important and was not complied with. As to the transference of guilt issue, in this case the number of conspiracies, assuming that there was more than one, was too small to create a substantial risk of danger or of juror confusion. Too small? Yes, ma'am. A number of conspiracies. A number of conspiracies. Not the number of people. Correct, Your Honor. And in fact, as the Court knows, four co-conspirators went to trial, and the government introduced Government's Exhibit No. 2, which was an organization chart to help the jury distinguish the testimony and who did what. They also introduced Government's Exhibit 3, which was a chronological listing of steps taken from 2013 to 2015. And the government also introduced Government's Exhibit 142, which set out the red flags of money laundering. You know, what I think you're saying is, yes, the government charged multiple conspiracies, but, hey, they've charted them out for the jury and they explained them, and therefore it's not a problem. Your Honor, that truly is not what I'm saying. Okay. And I'm not opining on whether there's error. It just seemed like a very aggressive joinder of defendants to me. Well, if you go to the Rojas factors, if you look at the common goal of all those involved, and that was to profit from drug sales and from concealing the proceeds of that drug sale, those drug sales, sending them back to Mexico, you look at the nature of the scheme, and this scheme was an agreement that contemplated continuing cooperation among the co-conspirators for success. So there was one conspiracy, and these organizations did operate to the advantage of the other, especially if you consider what my friend on the other side says is the Valencia and the Estrada organization, because Miguel Rivas Estrada was getting money from the activities of the Valencia. Then when you consider the overlapping participants, again, this was a conspiracy that involved a division of labor, and that's what made the conspiracy successful. And as we point out, the conspirators, co-conspirators, are not required to know the details of the study scheme. I want to ask you about the arguments that Mr. De La Garza made. I didn't see in his brief a claim of fatal conflict in the jury responses. I just saw a claim of insufficient evidence. Did I miss something? Insufficient evidence as to Torres Lopez. Yeah, he makes that claim, but the argument that was made to us here today is one of fatal conflict between two jury answers. I don't recall that being a point in the appellate brief. Did I miss something? No. Okay. Then I also want to ask you, I realize that her counsel is not here, but I did have a question on Centeno Herrera. I understand that she put on no evidence at all that the cancer affected her mind, like her ability to form intent. But I also understood the argument to be that she's just not around. She's busy getting chemo. She's getting radiation. She's having to sit home so that she doesn't get exposed to, you know, a cold can make you very ill if you're, you know, in chemotherapy, et cetera, et cetera. Why would that not be relevant? Like, I'm not around to be able to figure out what's going on because. Why is that not relevant? Well, she did testify, and I believe she said something like six times, I wasn't there. I wasn't around. It was on my daughter. But she couldn't explain why. I mean, that sounds kind of flaky, like, oh, I wasn't there. Yeah, sure you weren't. But if you said I wasn't there because I was getting chemotherapy, because my doctor made me stay home, because I couldn't be exposed to the ordinary colds and flus and whatnot, that would give it a little more heft. I mean, it would give some support to it. Why is that not relevant to that point? Well, we believe under Rule 403 the fact that she had cancer was more substantially prejudicial than it was probative, and it would have helped that because she was able to testify that she couldn't be there. And I thought, let me see if I have the quote. There's a quote in her testimony. I believe she said something like, due to circumstances beyond my control, I was not able to be there. So she kind of made the same point without prejudicing the jury or causing them to be overly sympathetic because she had cancer. The way I read the transcript of Judge Mazzant on this question, doesn't he offer her trial counsel the ability to renew this? Because there was a motion on the cancer testimony, and so he takes the documents in camera, looks at them, says these seem to go to sympathy not availability or being at the money laundering facility at the time of the money laundering, but says you can renew it when she comes to testify if this is going to be the testimony. And they don't do that? Am I understanding what happened? Yes, sir. That's exactly what happened before the trial started, before Vordier. But then there's another colloquy right before she testifies, or it's all done pretrial? Well, I'm sorry. I missed part of it. The way I read it, there's obviously a motion to eliminate pretrial where the judge looks at the documents and determines that they don't go to whether and to what extent she was at the facility at the time of the money laundering. But then it looks like there is another colloquy right before she comes to testify after the judge has ruled on the motion in limine. And he gives the defense lawyer another opportunity to say, well, no, actually we would like to use the cancer evidence, but in a different way, and it just doesn't happen. That's how I— Judge Mazzant did do that. What he said when counsel asked him a second time, will we be able to use this evidence if she testifies, Judge Mazzant said, we'll take it up again if she testifies. Because as I'm sure the court is aware, sometimes defendants think that they will testify and then they end up not testifying. So it makes sense that the judge would postpone a ruling. And then right before he called her or as he started—before he started questioning her, he said, counsel said, I'm not going to touch that issue. But, you know, the way he said that is because he's afraid of violating the motion in limine and being held in contempt. It's clear because he says, I'm terrified. I don't know how I'm going to avoid this. And then the judge lets him make an offer of proof, and you don't typically let a lawyer make an offer of proof when you don't think they've asked for it. So I don't understand why at the end we're having an offer of proof if, in fact, it was waived. It makes sense to me. I think it was at the court's initiative trying to preserve any error, if there was. But he's a former court of appeals judge. I mean, he may not—this may have been his first big trial or whatnot, but he didn't just fall off the hay truck there. And so he understands the concept of, in order for there to be an offer of proof, there had to have been a request for something that was denied. And then you make the offer of proof to show what the judge omitted. I don't understand how you get to that point if you haven't omitted anything. Well, it's my read of the record that he allowed the offer of proof because from the beginning he excluded the evidence of her condition and of the cancer. And that, to me, appears to be the only reason that he allowed it. But your position would be even if he should have let her explain why she was gone, she did get to explain that she was gone and that it had something to do with medical without getting into the details, and that was good enough? Yes, ma'am. Yes, ma'am. Especially when you look at the strength of the evidence against Torres Lopez because her— Oh, I'm talking about Santana Herrera. Oh, that's right. I'm sorry. The evidence was very strong against her as well. Mr. Taleseca testified that he dropped off huge amounts of money two to three times a day— To her. To her, and that he would leave, then she would wire the money, she would structure it, and then she would call him with code words saying your order is ready or something to that effect when it was time for him to pick up the receipts. Let me ask one other question. Did these remitters have any legitimate business? You're talking about the brick and mortar stores? Yeah. It appears that they did, but if you look at Torres Lopez's wire transfer business, the testimony was that right before the money laundering occurred, during the month, I believe it was January 2013, there were nine wire transfers total. But once the money laundering conspiracy was in full swing, it escalated every month. So—and I think the testimony also was—I can't recall if it was Torres Lopez or Centeno Herrera, but Ms. Amaker testified when she was totaling the amount that each of those stores sent to Mexico to the suspect beneficiaries. It was obviously a lot of money. Right. She said that it was 50%, at least 50% of the transactions. So it does appear that they did have legitimate wire transfer business. Okay. Just wanted to know. Thank you. Thank you. All right, Mr. Springer, do you have rebuttal? Sure. Thank you, Your Honor. I wanted to address this argument counsel made about there being some link because of the tax services store that was trained by an individual. And I remember it's been a while since I've read this record. I remember that part of the testimony. I do not remember that being a part of the government. I don't remember it. I was looking through the brief trying to find it. I'll just say this about it. If it is some crucial link between all these organizations, it was certainly not emphasized at the trial. And I don't think it was anyway because I'm fairly certain that I know this tax organization was one of the money remitters, and all of the organizations were using a lot of the folks who transmitted money. But when it came to the couriers who were down below, none of them appeared to be using the same couriers in the evidence that I reviewed. The other argument with respect to this all being an evidentiary issue as regards Mr. Revis Estrada and Judge Mazant approaching it that way, I don't know that that's a fair characterization, frankly. And I do believe it emphasizes the problem that we're trying to urge the court to review, which is what can a trial judge do when this single conspiracy has been alleged and yet all this evidence is coming in and the trial judge is trying to figure out along the way whether there really is a single conspiracy or multiple conspiracies. Well, did anyone ask for a bill of particulars? I don't believe so. They're allowed to do that, right? That's true. That's fair. But I will say Judge Mazant was confronted with the issue several times, and I don't know what a trial judge could do. I mean, the obligation of the government would have been to segregate these folks, but the government didn't go far enough up in the organizations to be able to do that. It stopped with the organizers, and there were multiple organizers in each one of these conspiracies. Well, it seems to me that Mr. Revis was pretty high up. Well, but Mr. Revis's boss was Mr. Barajas in Mexico, who is only mentioned one time in the record on page 776. Well, I understand that, but I mean Revis and the people around in his immediate orbit were the ones who dealt with the money launderers. I think that's fair, Your Honor, but they didn't deal with the other leaders in the other organizations, and that's the problem. There was no real evidence about that. Okay. Thank you once again for the opportunity, and it's been a pleasure to be here. Thank you. Mr. De La Garza. Since I only know I have one minute. To answer your question, Judge Haines, in my brief, we do mention in argument form, number one, that the jury verdict of not guilty for the drug conspiracy was somewhat illogical because it involves the same evidence. I'm looking at your statement of issue, and it says the evidence was insufficient that the appellant was a member of the charged conspiracy alleged in Count Toothing Diamond. It does not say there's a fatal conflict between the two jury answers. If that's your contention, that needs to be clearly stated in the brief, and you certainly say, hey, they acquitted her so she wasn't part of the drug conspiracy, but you don't say there's a fatal conflict, and therefore you cannot issue a judgment based upon the guilty finding. That's correct, Judge. By all means, that is correct. But what I'm trying to say, and maybe not very well, what I'm trying to say is by virtue of the jury finding her not guilty, the jury is in essence saying that they're not finding this evidence to be credible, the same evidence that they, quote, unquote, relied on in finding her guilty of the conspiracy. Well, beyond a reasonable doubt is 95 percent. They may have thought there was 94 on the drug and 96 on the money laundering, and that's where we ended up. It's not the same thing as there's no way they could have found her guilty of the money laundering by acquitting her. If they had found her innocent of the drug conspiracy, you might have a better argument. They didn't. They found her not guilty, which is a very big difference. I understand, and we take what we can get, Your Honor. It's not every day we get a not guilty in anything in federal court. There you go. But we take what we can get. I filed a Rule 29 motion also arguing that it was inconsistent. Judge Mazant ruled as he ruled. I have a lot of respect for Judge Mazant. But at the end of the day, we don't believe the government proved that, and that's why we're asking you all to reverse the decision for Ms. Filippa Torres, Your Honor. All right, sir. Thank you very much. Thank you for the opportunity, judges. I appreciate it. Well, I want to say to both you and Mr. Springer, since you're court appointed, we know that you're doing special service for the court in representing these clients, and you did a very good job, and we certainly appreciate your service. Thank you, and we appreciate you all taking the time. Come back again sometime. Thank you. Thank you.